## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JACK L. WEBER, III AND | ) | |
| JACQUELINE L. WEBER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 16 C 6620 |
| v. | ) | |
| | ) | |
| SETERUS, INC., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Jack L. Weber, III and Jacqueline L. Weber ("the Webers") sued defendant Seterus, Inc. ("Seterus") for breach of contract and violations of federal law in connection with Seterus's management of their mortgage escrow account. Currently before the Court is Seterus's motion for summary judgment (R. 94). For the reasons that follow, the Court denies in part and grants in part Seterus's motion.

## Background

### A.     The Webers' Mortgage

In January 2004, the Webers took out a $250,500 mortgage loan with Bank of America, N.A. ("BANA") for their home in Algonquin, Illinois. R. 103 (Ps' Resp. D's L.R. 56.1 Statement of Facts) ¶¶ 1, 2. Section 3 of the mortgage states:

> Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items . . . . In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items . . . . Lender may revoke the waiver as to any or all Escrow Items at any

time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3. If . . . Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.

*Id.* ¶ 10. Section 9 of the mortgage in turn states:

If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest . . . . Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower.

*Id.* ¶ 11.

### B.    Prior Litigation over Property Tax Payment Issues

Beginning in 2011, the Webers litigated a dispute in Illinois state court against BANA, which eventually settled. *Id.* ¶ 9. That litigation involved BANA's allegedly improper payment of the Webers' property taxes. *Id.* ¶ 12; R. 105 (D's Resp. Ps' Statement of Additional Facts) ¶ 12. The July 2013 settlement agreement between BANA and the Webers states that the Webers are "responsible for paying and maintaining any and all real estate taxes . . . on the property pursuant to the terms of the original note and mortgage." R. 103 ¶ 12.

### C.    Further Property Tax Payment Issues

Following the Webers' settlement with BANA, the Webers paid their own property taxes as the settlement agreement said they would. R. 105 ¶ 8. But a few years later, a similar issue arose. The Webers timely paid the first installment of their property taxes for 2015 (totaling $4,694.71) on June 4, 2015. *Id.* ¶¶ 2, 7. On

June 8, 2015, BANA separately paid the Webers' first installment property taxes and established an escrow account. R. 103 ¶¶ 14-15.

The circumstances surrounding BANA's duplicate payment and establishment of an escrow account are disputed by the parties. BANA represented in communications with the Webers that it paid the taxes because it received notice from the McHenry County Tax Assessor that the property taxes were delinquent. *Id.* ¶ 43. But BANA's corporate representative clarified in her testimony that no one from McHenry County contacted BANA about the delinquency; instead, an employee from BANA reviewed the McHenry County Treasurer ("MHCT") website as of June 8, 2015 and allegedly saw a delinquency. R. 105 ¶ 3. The Webers dispute the credibility of this testimony, noting that the MHCT website does not list delinquent amounts under its payment section, BANA did not take a screenshot of the website, and Jack Weber's testimony and tax records reflect that the Webers' payment was on time. *Id.* ¶¶ 1, 2, 4-7. It is undisputed that the Webers' tax statements produced by MHCT do not indicate that the property tax payment the Webers made on June 4 was delinquent. *Id.* ¶¶ 1-2. It is also undisputed that BANA did not reach out directly to the Webers to determine whether they paid the taxes, or perform an investigation beyond allegedly looking at the MHCT website. *Id.* ¶ 5.

BANA notified the Webers about the escrow account on June 19, 2015, stating, "New monthly escrow payment - $1,610.60 . . . New monthly home loan payment effective 8/2015 - $3,052.62," but also stating "the escrow portion of your monthly loan payment may be changing effective 08/01/2015," and "[t]here's nothing

you need to do." R. 103 ¶ 18; R. 105 ¶ 9. Following BANA's notice, the Webers continued to send their regular monthly payments of $1,442.02 for principal and interest only. R. 103 ¶ 19. Jack Weber saw this as a repeat of the issue the Webers had settled with BANA in the prior lawsuit, testifying that "since the end of that [lawsuit], we've paid [property taxes] on our own," and then "here it is again that we've received another one of these notices." R. 105 ¶ 8.

In late June 2015, MHCT issued a $4,692.71 refund to BANA for the property tax payment, which BANA credited to the escrow account. R. 103 ¶ 20. But BANA did not close the account. R. 105 ¶ 32.

Both BANA and the Webers paid the second property tax installment (totaling $4,623.36) in August 2015. R. 103 ¶ 21; R. 105 ¶ 7. This time, MHCT issued the $4,623.36 refund for the double payment to the Webers. R. 103 ¶ 22. BANA increased the Webers' mortgage payments due starting September 1, 2015 to $2,591.55 based on the tax payment, and the Webers continued to pay the principal and interest only of $1,442.02. *Id.* ¶¶ 23-24. Instead of remitting the refund they received from MHCT to BANA or letting BANA know they received it, the Webers put it in a segregated account and retained counsel. *Id.* ¶¶ 26-27; R. 105 ¶ 13.

In September and October of 2015, BANA sent letters notifying the Webers that their payments were insufficient. R. 103 ¶ 25. In November 2015, BANA sent the Webers a notice of its intent to accelerate the loan. *Id.* ¶¶ 28, 29.

**D.    Transfer of Servicing to Seterus**

On December 1, 2015, Seterus took over for BANA as loan servicer for the Webers' mortgage. *Id.* ¶¶ 3, 4. BANA assigned the Webers' mortgage to the Federal National Mortgage Association ("Fannie Mae") later that month. *Id.* ¶ 5. Taking over as servicer did not make Seterus mortgagee or the owner of the loan. *Id.* ¶ 7. Seterus never signed the note, the mortgage, or the settlement agreement the Webers entered into with BANA. *Id.* ¶¶ 8-9.

When it took over as servicer, Seterus received all of BANA's records related to the loan, including the Webers' settlement agreement with BANA and a document indicating that BANA received a property tax refund in June 2015. R. 105 ¶¶ 15, 16. Seterus's policies and procedures require it to undertake data integrity checks for new accounts, and to work with prior servicers to resolve issues. R. 103 ¶¶ 36-38. Seterus's corporate representative testified that "[r]eading the escrow payment and refund in conjunction" with the settlement agreement "could potentially raise a red flag," and "[t]his is supposed to be reviewed during the boarding process and caught there," but "[i]t was not" caught by Seterus's data integrity check. R. 105 ¶¶ 17, 29; R. 95-5 at 44-45.

At the time of the servicing transfer to Seterus, the Webers' loan had a stated escrow deficiency of $2,324.30. R. 103 ¶ 31. BANA's corporate representative testified that BANA informed Seterus at the time of the service transfer that: (1) the taxes were delinquent on June 8, 2015; and (2) it was BANA's understanding that the escrow account was proper because BANA had not been reimbursed the

funds sent to the Webers. *Id.* ¶ 40. Seterus relied on information provided by BANA to determine that the escrow account was properly opened. *Id.* ¶ 41.

Seterus sent the Webers a letter following the servicing transfer informing them that their total payment amount for December 1, 2015 through February 1, 2016 was $2,591.55. *Id.* ¶ 32. On January 18, 2016, Seterus sent the Webers a notice advising them that their new monthly payment amount was $2,261.52 effective March 1, 2016, and advising them of an escrow "shortage and/or deficiency" of $2,349.54. *Id.* ¶ 39; R. 105 ¶ 19.

On February 18, 2016, BANA emailed Fannie Mae to see if Seterus had permission to work with BANA on the following complaint received by BANA (presumably from the Webers):

> We paid out property taxes however we were sent a refund due to duplicate payment. The refund was sent back to us on 9/4/2015 however we did not apply it to the loan. Since then an escrow account was added to the loan and the customer continued with their regular non-escrowed monthly payment. This caused the account to fall into a delinquent status. However Tax is currently locating the funds and will be transferring to the new servicer. My concern is how we rectify the customer's account by applying their monthly payments with no escrow as it should have been and bring their account to current as it should be.

R. 105 ¶ 20; R. 95-12 at 4.

Fannie Mae in turn requested that Seterus work with BANA on this issue. R. 103 ¶ 46; R. 95-12 at 4. Following a review of information provided by BANA, Seterus advised Fannie Mae in an email on February 25, 2016: "We need some kind of documentation to waive the current escrow payment," and "we are unable to close the escrow account in full until we get the refund posted to this loan so we also . . .

need BA[NA] to remit funds." R. 103 ¶ 46; R. 95-12 at 3. Fannie Mae responded: "Is it a normal process to reach out to the prior servicer for the doc to waive the current escrow payment or do you reach out to the borrower? To me, since it is BA[NA] that caused the error, I would think it would be BA[NA] that we should reach out to." R. 105 ¶ 20; R. 95-12 at 3. Fannie Mae further instructed Seterus: "you should reach out to BA[NA] and ask that they remit funds ASAP." *Id.*

Seterus requested additional information from BANA on February 29, 2016 and again on March 23, 2016. R. 103 ¶ 49; R. 105 ¶ 24. Seterus did not receive a response from BANA until a number of months later, after the Webers had already filed this lawsuit. R. 103 ¶ 50.

BANA sent the Webers a letter on February 29, 2016 stating that "Bank of America received notification from the McHenry County Tax Assessor that your property taxes were delinquent." *Id.* ¶ 43. BANA further explained:

> A tax payment was paid on August 17, 2015 to your Tax Authority McHenry County for the August tax installment in the amount of $4,623.36. As of January 23, 2016 a refund has been requested for the payment of $4,623.36. Please allow 6-8 weeks for the refund to be received and then forwarded to your new servicer. We have advised your new servicer Seterus, Inc. of this information and they have advised they will be reaching out to you to address your concerns.

*Id.* ¶ 44. After receiving this letter, the Webers did not advise BANA or Seterus that they received the August 2015 refund. *Id.* ¶ 45.

On April 25, 2016, the Webers, through their counsel, sent a notice of error to Seterus alleging that Seterus committed numerous servicing errors. *Id.* ¶ 51. That notice focuses on the establishment of an escrow account, and does not state that

the Webers received the refund and put it in a segregated account. R. 103 ¶ 51; R. 105 ¶ 21; R. 1 Ex. 16.

A correspondence specialist for Seterus looked into the issues raised by the Webers in their notice of error. R. 103 ¶¶ 52, 56. The extent of Seterus's investigation is the subject of disagreement among the parties. *See* R. 105 ¶¶ 23, 29, 30. Seterus's servicing notes for May 2016 contain only one note concerning the Webers' April 2016 notice of error, which fails to indicate that Seterus reviewed anything more than the letter sent by BANA to the Webers. *Id.* ¶ 22, 30. But Seterus employees testified that servicing notes do not reflect all steps taken in researching responses to notices of error, and also testified to review of the BANA payment history and the settlement agreement. *Id.*

It is disputed whether Seterus implemented its internal "control point" regulation process to address the notice of error. *Id.* ¶ 30. But it is undisputed that when asked how Seterus's "policies and procedures" are "set up," Seterus's corporate representative admitted: "What should have happened is, I mean, we should have reached out to Bank of America to get that refund." *Id.* ¶¶ 25, 30; R. 95-5 at 94. He further testified:

> Q: How do you reconcile the fact that Seterus just stopped its direction from Fannie Mae to sort out the escrow issue with Bank of America? How is that not an unfair practice?
> A. I guess it would be unfair.
> Q. The borrower is asking you to fix it. Fannie Mae is asking you to fix it right in the same timeframe, and ultimately nothing was done, correct?
> A. Yes, it looks like it.
> . . .

> Q. How do you reconcile what happened in this case to – to the allegation in your answer that Seterus's processes and procedures include without limitation strict prohibitions on treating borrowers unfairly?
> A. I could see how it could be perceived by not reaching out to Bank of America that they were possibly treated unfairly.
> . . .
> Q. And not telling the borrowers all that you knew about their concern about their escrow and their loan, correct?
> A. Yes.

R. 105 ¶ 25; R. 95-5 at 114, 120-21 (attorney objections to form omitted). It is also undisputed that as part of its review, Seterus never reached out to other departments or reviewed the MHCT website. R. 105 ¶¶ 23, 29.

Seterus sent a timely June 1, 2016 written response to the Webers' counsel. R. 103 ¶¶ 54-55. That letter attached the February 29 letter from BANA to the Webers, and advised:

> This letter [from BANA] advises . . . that due to the notification (from the McHenry County Tax Assessor) on June 8, 2015 that the property taxes were delinquent, an escrow account was established pursuant to the terms of the original Note and Mortgage . . . the settlement agreement stated that the escrow account was subject to the terms of the original Note and Mortgage, which allow for an escrow account to be established if the servicer is notified of delinquent taxes. As the letter also advised, a refund in the amount of $4,692.71 was received from McHenry County and was applied to the escrow account on June 25, 2015. An additional refund was requested by Bank of America, but has not yet been received. Additionally, our records indicate that on May 19, 2016 a disbursement in the amount of $4,616.65 was distributed from escrow to satisfy county taxes. As a result, the escrow account has a deficient balance of $5,791.42. Please be advised that until the escrow account deficiency is resolved, we must decline to close the escrow account and will continue to collect for taxes. . . . Due to the partial payments received, the loan became delinquent . . . .

R. 105 ¶ 27; R. 1 Ex. 26.

BANA separately sent the Webers a letter a few days later, on June 3, stating:

> Bank of America's records indicate that the escrow account was impounded for the payment of county taxes on June 8, 2015 because the taxes were delinquent. . . . Regarding your allegations of errors related to the payment of county taxes in connection with the loan . . . Bank of America expressly disputes your claim that errors occurred, and no further response will be provided.

R. 103 ¶¶ 57-59. About a week and a half before this correspondence, on May 24, Pierce & Associates, P.C. ("Pierce"), at the direction of Seterus, sent a notice of foreclosure to the Webers threatening them with fees and expenses. R. 105 ¶ 28.

### E.     The Current Lawsuit

The Webers filed this suit in late June 2016. R. 1. The Webers subsequently settled with both BANA and Pierce, leaving only Seterus as a defendant. R. 103 ¶ 61.

## Standard

The Federal Rules of Civil Procedure "explicitly allow for 'partial summary judgment.'" *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a). "At the summary-judgment stage, the court can properly narrow the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist." *Id.* (emphasis in original).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all

of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

The Webers bring claims against Seterus for: (1) breach of contract under Illinois law (Count 5); (2) violation of the Real Estate Settlement Procedures Act, ("RESPA") (Count 7); (3) violation of the Fair Debt Collection Practices Act ("FDCPA") (Count 8); and (4) violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") (Count 9). The Court analyzes each claim in turn.

## I. Breach of Contract

"Under Illinois law, a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party, or by an intended third-party beneficiary of the contract." *Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001). Privity is a "mutual or successive relationship to the same rights of property" that places "the assignee in the shoes of the assignor." *Id.*

The Webers' breach of contract claim against Seterus is premised on the settlement agreement and the mortgage. But Seterus did not sign either of these documents. R. 103 ¶¶ 8-9. Seterus is merely the loan servicer. *Id.* ¶¶ 3, 7.

"A significant majority of courts have concluded that loan servicers are not in privity of contract with mortgagors where the servicers did not sign a contract with the mortgagors or expressly assume liability," and therefore have declined to recognize breach of contract claims against loan servicers. *Mazzei v. Money Store*, 308 F.R.D. 92, 109 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016). As the Webers point out, the Seventh Circuit is in the minority. It has recognized that "servicing refers to the exercise of rights that are conferred by a partial assignment of a mortgage by the mortgagee." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 645 (7th Cir. 2007). In other words, when servicing rights are transferred, servicers are assigned "some of the rights created by the mortgage contract—the 'servicing rights.'" *Id.* But the *Ocwen* court made clear that a servicer may be liable for breach of contract only "if he violates the terms of the part of the mortgage contract that has been assigned to him." *Id.* In other words, a servicer may be liable only for violating servicing-specific "obligations under the relevant contract," if any exist. *Bonfiglio v. Citifinancial Servicing, LLC*, 2015 WL 5612194, at *7 (N.D. Ill. Sept. 23, 2015) (citing *Ocwen*, 491 F.3d at 645).

Here, as in *Bonfiglio*, Seterus "is not a party to the mortgage agreement and the plain terms of the mortgage agreement" allegedly breached "do not deal with loan servicing." *Id.* The Webers claim that Seterus violated § 3 of the mortgage,

which allows the "Lender" to revoke an escrow waiver only by notice given in accordance with § 15 of the mortgage. R. 102 at 8 (citing R. 95-1 at 17). But both § 3 and § 15 of the mortgage discuss obligations of the "Lender." R. 95-1 at 16-17, 23. Neither § 3 nor § 15 refers to loan servicing or describes any obligation of the "Loan Servicer," which is a term separately defined in the mortgage. *See* R. 95-1 at 24 ("A sale might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.").

Analyzing a similar definition of loan servicer in a mortgage document, the court in *Trunzo v. Citi Mortg.*, 876 F. Supp. 2d 521 (W.D. Pa. 2012), explained: "As a 'servicer' only receives limited rights and obligations under the mortgage contract relating to servicing, it is not a party to the original debt instruments like a 'lender' or 'note holder,' and, therefore, cannot be held liable for breaches in obligations that remain held by the 'lender' or 'note holder.'" *Id.* at 533. The *Trunzo* court found this conclusion supported by RESPA's definition of "servicer" as "an entity that receives 'any scheduled periodic payments from a borrower pursuant to the terms of any loan.'" *Id.* (quoting 12 U.S.C.A. § 2605(i)(3)). The *Trunzo* court further explained that "neither the mortgage nor the note" in that case "require[d] a 'servicer' to assume the same obligations as a 'lender' or 'note holder,' and the mortgage itself create[d] a distinction between a 'Note Purchaser' and 'Servicer.'" *Id.* Finding that the borrowers had not "sufficiently supported their legal conclusion that [the

servicer] assumed the obligations of a 'note holder' or 'lender'" that were allegedly breached, the Court dismissed the breach of contract claim. *Id.* at 354.

As in *Trunzo*, the Webers have not set forth any evidence that Seterus succeeded the "Lender" obligations in the mortgage that the Webers say were breached. Like in *Trunzo*, neither the Webers' mortgage nor their note requires a servicer to assume the same obligations as the "Lender," "Note Holder," or "Note purchaser," and the mortgage instead creates an explicit distinction between a "Note purchaser" and a "Loan Servicer." *See* R. 95-1 at 9-27 (note and mortgage); R. 95-1 at 24 (mortgage distinguishing between "Note purchaser" and "Loan Servicer"); R. 95-1 at 9-11 (note defining "Note Holder" and not discussing loan servicer). Moreover, the "Assignment of Mortgage" to Fannie Mae purports to transfer "all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described . . . and all rights accrued or to accrue under said Mortgage," and describes "Seterus" only as the entity "responsible for receiving payments." R. 95-1 at 29-30.

Because the Webers have not presented evidence creating a genuine issue of material fact as to whether Seterus breached a servicing obligation *assigned to it* under the mortgage, the Webers' breach of contract claim based on the mortgage fails as a matter of law. *See, e.g.*, *Bonfiglio*, 2015 WL 5612194, at *7 (no breach of contract claim absent allegations that servicer breached obligations assigned to it); *Trunzo*, 876 F. Supp. 2d at 533-34 (same); *Phillips v. Ocwen Loan Servicing, LLC*, 92 F. Supp. 3d 1255, 1290 (N.D. Ga. 2015) (granting summary judgment on breach

of contract claim and distinguishing *Ocwen* based on lack of "evidence" that servicer was "even a 'partial assignee' of the Loan contract").

The *Bonfiglio* court went on to find that a servicer could be liable for breach of contract if it was a party to a later agreement modifying the mortgage agreement. 2015 WL 5612194, at *7; *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560-61 (7th Cir. 2012) (evaluating whether loan servicer violated loan modification agreement it signed). The only other document based on which the Webers allege breach of contract in this case is the settlement agreement. But Seterus did not sign the settlement agreement, R. 103 ¶ 9, and despite the Webers' conclusory assertions to the contrary, Seterus is not "a party to the Settlement Agreement" simply "because BANA transferred servicing to it." R. 102 at 7. The Webers cite no case recognizing that a servicer becomes party to a separate, private agreement between the former servicer and the borrowers when servicing rights are transferred. Like their claim based on the mortgage, the Webers' breach of contract claim based on the settlement agreement fails as a matter of law.

For these reasons, the Court grants Seterus's motion for summary judgment on the Webers' breach of contract claim (Count 5).

## II. RESPA

The Webers allege that Seterus violated a provision of "Regulation X," a regulation promulgated pursuant to RESPA, by failing to properly respond to the Webers' April 25, 2016 notice of error. R. 1 at 43-50. Regulation X, which took effect on January 10, 2014, "requir[es] a loan servicer to respond to a notice from a

borrower identifying an error in the servicing of his mortgage loan." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1005 (11th Cir. 2016).

## A.    Private Right of Action

As an initial matter, Seterus challenges whether there is a private right of action for violations of 12 C.F.R. § 1024.35, the provision of Regulation X on which the Webers base their claim. Although "RESPA" itself "provides for a private right of action for violations of its requirements," *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 681 (7th Cir. 2011), courts have disagreed about whether the same is true for various provisions of Regulation X.

Seterus is correct that some courts have held that there is no private right of action for violations of 12 C.F.R. § 1024.35. *E.g.*, *Brown v. Bank of N.Y. Mellon*, 2016 WL 2726645, at *2 (E.D. Va. May 9, 2016). But the weight of recent authority—including decisions by courts in this district—is to the contrary. *E.g.*, *Lage*, 839 F.3d at 1007 (recognizing private right of action); *Blanton v. Roundpoint Mortg. Servicing Corp.*, 2016 WL 3653577, at *5-6 (N.D. Ill. July 7, 2016) (same); *Starke v. Select Portfolio Servicing, Inc.*, 2017 WL 6988657, at *4-5 (N.D. Ill. Dec. 18, 2017) (same and collecting cases).

This Court finds the reasoning adopted by courts finding a private right of action persuasive. The Supreme Court has directed courts to refer to the statute pursuant to which a regulation was promulgated to assess whether the regulation provides a private cause of action. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a

right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). "Where a statute provides for enforcement through a private cause of action, a regulation may also be enforced in the same way." *Starke*, 2017 WL 6988657, at *5 (citing *Alexander*, 532 U.S. at 291).

As the *Starke* court explained, "in enacting the relevant sections of Regulation X, the Consumer Financial Protection Bureau ('CFPB') tied § 1024.35 to a privately enforceable statute, stating that it implements 'section 6(k)(1)(C) of RESPA, and to the extent the requirements are also applicable to qualified written requests, sections 6(e) and 6(k)(1)(B) of RESPA.'" *Id.* (citing *Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X)* ("*Mortgage Servicing Rules*"), 78 Fed. Reg. 10696, 10737 (Feb. 14, 2013)). And again, RESPA explicitly provides a private cause of action. *Catalan*, 629 F.3d at 681. Like the court in *Starke*, this Court concludes that § 1024.35 therefore "effectuates a privately enforceable statutory right." 2017 WL 6988657, at *5.

### B. Merits of RESPA Claim

Turning to the merits of the Webers' RESPA claim, neither party disputes that the Webers' April 25, 2016 correspondence with Seterus qualifies as a notice of error or that Seterus's June 1, 2016 correspondence with the Webers qualifies as its response for purposes of RESPA and Regulation X. "[S]ection 2605(e) [of RESPA] and its corresponding regulations (12 C.F.R. § 1024.35) outline a servicer's obligations with respect to responding to a notice of error." *Blanton*, 2016 WL 3653577, at *6. "[A] servicer must respond to a notice of error by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction . . . ; or

(B) Conducting a *reasonable* investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information . . . for further assistance.

12 C.F.R. § 1024.35(e)(1)(i) (emphasis added); *see also* 12 U.S.C. § 2605(e)(2). Seterus does not argue that it corrected any errors under part (A) of the regulation, but instead maintains that it conducted a "reasonable investigation" and provided a statement complying with part (B).

Courts have interpreted "reasonable investigation" to mean "a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons." *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014); *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1191 (S.D. Fla. 2015), *aff'd*, 839 F.3d 1003 (11th Cir. 2016) (same); *see also Khan v. OneWest Bank, F.S.B.*, 2017 WL 1344535, at *9 (N.D. Ill. Apr. 12, 2017) (even where servicer's "letter responds to the general subject matter raised by [a borrower's] request and the escrow shortage calculations appear to be accurate," complaint stated claim for failure to correct fees "after a reasonable investigation"); *Blanton*, 2016 WL 3653577, at *7 (plaintiff stated a claim for failure to "conduct a reasonable investigation").

Seterus argues that its investigation was reasonable as a matter of law because it was completely appropriate to maintain the escrow account. It notes that

RESPA provides that following a service transfer, the "new servicer shall treat shortages, surplusages and deficiencies in the transferred escrow account according to the procedures set forth in § 1024.17(f)." 12 C.F.R. § 1024.17(e)(2). Section 1024.17(f) in turn allows a new servicer—if an "escrow account analysis confirms a deficiency"—to "require the borrower to pay additional monthly deposits to the account to eliminate the deficiency." Seterus claims that its account analysis confirmed a deficiency entitling it to require additional monthly deposits.

This argument might suffice if Seterus had operated in a vacuum, without access to the settlement agreement and the underlying documents associated with the Webers' mortgage, and without any correspondence with BANA, Fannie Mae, and the Webers. But Seterus did not operate in a vacuum. RESPA's regulations required it to conduct a reasonable investigation once the Webers sent their notice of error, and Seterus had access to all of these sources to undertake that investigation.

The Court finds that two clusters of fact disputes defeat summary judgment on the Webers' RESPA claim. First, as set forth above, there are significant disputes as to what steps Seterus took in its investigation of the notice of error, which directly bears on whether its investigation was reasonable.

Second, the Court finds issues of material fact as to what a reasonable investigation would have uncovered, and therefore what should have been reflected in Seterus's notice of error response. The Webers' notice of error enclosed a copy of the settlement agreement, and it contested whether it was proper for BANA to

establish escrow and cause the Webers' monthly payments to nearly double in light of the Webers' prior settlement agreement with BANA on this same issue. R. 1 Ex. 19. Seterus's notice of error response concluded that there was no error. R. 1 Ex. 26.

The testimony of Seterus's corporate representative could be construed by a jury as an admission that Seterus should have done more in its investigation and response to the Webers' notice of error. He acknowledged that Seterus did "not tell[ ] the borrowers all that [it] knew about their concern about their escrow and their loan." R. 95-5 at 121. Indeed, Seterus had received emails indicating that the escrow account was improperly established and instructing it to fix the "error,"[1] which it did not tell the Webers. R. 95-12 at 3-4. Seterus's corporate representative further admitted: "What should have happened is, I mean, we should have reached out to Bank of America to get that refund." R. 95-5 at 94.

Even beyond these admissions, the Court finds fact disputes as to whether, if Seterus had conducted a reasonable investigation, it would have discovered that

---

[1]    The Court disagrees with Seterus that the "only identified issue contained in th[e]se emails concerns the location and application of the August 2015 Refund," which the Webers failed to remit to BANA or Seterus. R. 104 at 7. It is true that BANA's initial email inaccurately represents that the August 2015 refund was sent to BANA. R. 95-12 at 4. But BANA's email went on to describe a broader concern with "an escrow account . . . added to the loan" and the Webers "continu[ing] with their regular non-escrowed monthly payment," which "caused the account to fall into a delinquent status." *Id.* BANA sought to "rectify the customer's account by applying their monthly payments with no escrow as it should have been and bring their account to current as it should be." *Id.* Fannie Mae stated that BANA "caused the error" in a follow up email to Seterus, and instructed Seterus to "reach out to [BANA] and ask that they remit funds ASAP." *Id.* at 3. This email chain did not merely concern the refund (which everyone mistakenly believed BANA received), but also discussed "waiv[ing] the escrow payment" as a result of BANA's "error." *Id.*

BANA improperly established the escrow account, contrary to what Seterus stated in its response. The settlement agreement between BANA and the Webers plainly provided for a waiver of escrow and stated that the Webers would pay their property taxes. The mortgage allowed BANA to revoke the waiver and establish escrow "by a notice given in accordance with Section 15" and to pay an escrow item if the Webers failed "to pay the amount due." R. 103 ¶ 10. Whether BANA properly established an escrow account in June 2015 despite the settlement agreement and the Webers' timely payment in part depends on disputed issues surrounding BANA's alleged receipt of notice that the Webers' property taxes were delinquent.[2] The resolution of this dispute also bears on whether Seterus's notice of error response correctly stated that escrow was established "due to the notification (from the McHenry County Tax Assessor) on June 8, 2015 that the property taxes were delinquent." R. 105 ¶ 27; R. 1 Ex. 26.

Nor is it clear as a matter of law that BANA properly continued to maintain the escrow account because the Webers failed to remit their August 2015 property

---

[2] Seterus denies that this is a disputed issue. Seterus claims it is undisputed that "the Escrow Account was created by BANA following their receipt of a notice of delinquency from the McHenry County Tax Assessor." R. 96 at 1. But BANA's corporate representative testified that no one from MHCT contacted BANA about a delinquency, and that BANA instead relied on what the MHCT website showed as of June 8, 2015 to set up an escrow account for the Webers. R. 105 ¶ 3. And the Webers dispute the credibility of the BANA representative's testimony that the MHCT website reflected a delinquency. The Webers point to: (1) Jack Weber's testimony that he paid the taxes on time (*id.* ¶ 7); (2) tax statements produced by the MHCT showing no delinquency or late payment (*id.* ¶¶ 1-2); (3) the fact that the MHCT website does not list delinquent amounts under its payment section (*id.* ¶ 6); and (4) the fact that BANA does not have a screenshot of the contents of the MHCT website on which it relied (*id.* ¶ 4). This is a fact dispute for a jury to resolve.

tax refund to BANA. Especially in the context of the prior litigation and settlement agreement over similar escrow issues, the Court finds that the Webers are entitled to argue that BANA should have realized its mistake once it received the June 2015 refund from MHCT, terminated escrow, and not paid the August 2015 property taxes in the first place. A jury's assessment of this argument in turn bears on what a reasonable investigation by Seterus should have revealed and what should have been reflected in Seterus's notice of error response.

These remaining fact disputes distinguish this case from cases on which Seterus relies. In *Finster v. U.S. Bank Nat'l Ass'n*, 245 F. Supp. 3d 1304 (M.D. Fla. 2017), *aff'd*, 2018 WL 636603 (11th Cir. Jan. 31, 2018), the court granted summary judgment on a RESPA claim where there was "no evidence from which a fact-finder could conclude that U.S. Bank did not conduct a reasonable investigation." *Id.* at 1316. And in *Moore v. Seterus, Inc.*, 2016 WL 7374651 (S.D. Ala. Dec. 16, 2016), the court determined that the plaintiffs had failed to respond adequately on summary judgment and therefore were "deemed to have abandoned their remaining RESPA claims." *Id.* at *13.

## C.    Causation

Seterus further argues (with respect to all of the Webers' claims, including the RESPA claim) that the Webers cannot show that Seterus proximately caused their damages. The Court disagrees.

Seterus argues that the Webers' failure to remit the increased monthly payment amounts or the August 2015 tax refund makes the Webers wholly to blame

for their alleged damages. In support, Seterus cites *Hukic v. Aurora Loan Servs., Inc.*, 2007 WL 2563363 (N.D. Ill. Aug. 31, 2007), where the court explained that failure "to make a reasonable effort to avoid damages" bars recovery under Illinois law. *Id.* at *13. But unlike in *Hukic*, where the borrower waited until after foreclosure proceedings to act, *see id.*, here the Webers placed the August 2015 tax refund in a segregated account, retained counsel, and made requests to fix the problem. Additionally, as the Webers point out, they had at least some reason to believe that remitting the tax refund to BANA would not fix the problem given that BANA received a refund for the June 2015 property taxes and still did not close the escrow account.

To be sure, the Webers are partly to blame for their predicament, and it is hard to understand why they failed to notify BANA or Seterus of their receipt of the property tax refund in their notice of error and other correspondence. But the Court finds that determining whether the Webers failed "to make a reasonable effort to avoid damages" or exercised "reasonable diligence" (*Hukic*, 2007 WL 2563363, at *13) is a fact issue for the jury. The same conclusion applies to the causation elements of the Webers' FDCPA and ICFA claims discussed below.

### D. Statutory Damages

Finally, Seterus argues that the Webers are not entitled to statutory damages under RESPA. On this point, the Court agrees. RESPA's damages provisions state that individuals are entitled to: "(A) any actual damages to the borrower . . . ; and (B) any additional damages, as the court may allow, in the case

of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1). As the Webers acknowledge, "there must be more than two violations" to constitute a pattern or practice. R. 102 at 19 (citing *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 868 (N.D. Ill. 2002) (five violations sufficient to state a claim)). Each purported failure to respond to a notice of error is one RESPA violation. *See Ploog*, 209 F. Supp. 2d at 868.

The Webers' RESPA claim in this case is premised on Seterus's response to their April 25, 2016 notice of error (R. 1 at 43-50)—*i.e.*, a single alleged violation. And the Webers' general allegations regarding Seterus's "policies and procedures" (R. 102 at 19) are not sufficiently developed to defeat summary judgment. *Compare Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 858 (7th Cir. 2017) (even where plaintiffs set forth "[t]wo examples of similar behavior" of RESPA noncompliance by loan servicer, that was not "enough to support recovery of statutory damages" where the instances were "in different states, separated by a handful of years, and with no evidence of coordination").

\*     \*     \*

In sum, the Court denies Seterus's motion for summary judgment with respect to the Webers' RESPA claim (Count 7), except that it concludes as a matter of law that the Webers are not entitled to statutory damages on that claim.

### III. FDCPA

The Webers allege that Seterus violated five sections of the FDCPA: (1) 15 U.S.C. § 1692e(2) by "repeatedly and continuously misrepresent[ing] the character, amount or legal status of the loan," including misrepresentations regarding the escrow account (R. 1 ¶ 200); (2) § 1692e(5) by threatening foreclosure (R. 1 ¶ 201); (3) § 1692e(10) by making false representations in its notice of error response (R. 1 ¶ 202); (4) § 1692f by using "unconscionable means to collect" a debt (R. 1 ¶ 203); and (5) § 1692d by "employing an unfair and unconscionable means to collect the subject debt" (R. 1 ¶ 204). Seterus's motion for summary judgment on the FDCPA claims makes a number of separate arguments.

*First*, Seterus claims that its response to the Webers' notice of error does not qualify as a communication subject to the FDCPA because it was not made "'in connection with the collection of any debt'"—one of the threshold criteria that must be met for the FDCPA to apply.[3] R. 96 at 11-12 (quoting *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 388 (7th Cir. 1998)). The Seventh Circuit has since clarified that *Bailey* "does not . . . establish a categorical rule that only an explicit demand for payment will qualify as a communication made in connection with the collection of a debt." *Gburek*, 614 F.3d at 385. Although the Seventh Circuit has not "established a bright line rule for determining whether a communication from a debt collector was made in connection with the collection of any debt," it has

---

[3] Seterus does not dispute that it qualifies as a "debt collector" for purposes of the other threshold criteria. *See Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010).

determined that relevant factors include "the absence of a demand for payment," "[t]he nature of the parties' relationship," and "the purpose and context of the communications—viewed objectively." *Id.* at 384-85.

Seterus's notice of error response does not contain an explicit demand for payment, but it does calculate the "deficient balance" in the escrow account, advise the Webers of missing payments, and advise that the Webers' "loan became delinquent." R. 1 Ex. 26. The Court finds that a reasonable juror could conclude that, given the nature of the parties' relationship as servicer and borrower and the purpose and context of the notice of error, Seterus's response qualified as a communication made in connection with the collection of a debt.

*Second*, Seterus argues that it did not make any false representations in violation of § 1692e, which prohibits a "debt collector" from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Claims under § 1692e are typically evaluated under an "objective standard of the unsophisticated consumer," which assumes the debtor is "uninformed, naïve or trusting," but has "rudimentary knowledge about the financial world" and is "capable of making basic logical deductions and inferences." *Washington v. Portfolio Recovery Assocs., LLC*, 211 F. Supp. 3d 1041, 1048 (N.D. Ill. 2016). If a communication is sent to a debtor's attorney, on the other hand (as Seterus's notice of error response was in this case), the standard is whether the communication is "unlikely to deceive a competent lawyer." *Id.*

As Seterus acknowledges (R. 96 at 13), the validity of the Webers' claims under § 1692e turns on whether Seterus properly administered the escrow account. And as determined above, there are genuine issues of material fact as to whether Seterus's administration was proper. The Court specifically finds issues of fact as to whether Seterus made false representations in its notice of error response that would be likely to deceive a competent lawyer. As the Webers argue, the truth or falsity of the representation in the notice of error response that BANA properly established escrow after receiving a delinquency notice from MHCT, far from being readily discoverable, is still in dispute even after discovery in this litigation. *See Washington*, 211 F. Supp. 3d at 1048 (a factual misrepresentation "may be as difficult for a lawyer to see through as a consumer," including where the lawyer is "unable to discover the falsity of the representation without an investigation"). Especially given Seterus's corporate representative's admission that Seterus did not "tell[ ] the borrowers all that [Seterus] knew about their concern about their escrow and their loan," R. 95-5 at 121, the Court finds that Seterus is not entitled to summary judgment on the Webers' § 1692e claims.

*Third*, Seterus argues that it did not act in an abusive, harassing, or oppressive manner in violation of § 1692d or § 1692f. Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Section 1692f similarly prohibits a debt collector from using "unfair or

unconscionable means to collect or attempt to collect any debt." Both sections contain non-exhaustive lists of practices that qualify.

Seterus claims that because it did not make any threatening phone calls or in person visits to the Webers, or otherwise use an intimidating tone, the Webers cannot demonstrate that any of Seterus's actions violate §§ 1692d and f. The Court agrees with Seterus that the Webers' claims under §§ 1692d and f are the weakest of their FDCPA claims. But the question of whether a particular collection practice satisfies the standards in §§ 1692d and f is ordinarily one for the jury. *See Todd v. Collecto, Inc.*, 731 F.3d 734, 739 (7th Cir. 2013) ("Whether a particular collection practice other than those specified in § 1692f qualifies as unfair or unconscionable is assessed objectively and is a question for the jury unless reasonable jurors could not find that the practice described rose to that level."); *Michaelson v. CBE Grp., Inc.*, 2015 WL 2449038, at *2 (N.D. Ill. May 21, 2015) ("In applying section 1692d, the question whether conduct harasses, oppresses, or abuses will ordinarily be a question for the jury."). And courts have allowed claims to go forward under § 1692f based on unfair foreclosure practices. *See, e.g., Kabir v. Freedman Anselmo Lindberg LLC*, 2015 WL 4730053, at *5 (N.D. Ill. Aug. 10, 2015) (allegations that defendant "engaged in an unfair practice by attempting to obtain a default and judgment of foreclosure . . . in a foreclosure case that was no longer pending" stated a claim for violating § 1692f). In light of the fact that Seterus (through Pierce) actively threatened the Webers with foreclosure and fees, and in light of Seterus's corporate representative's admissions that it should have acted differently and that

its conduct may have been unfair, R. 95-5 at 114, 120-21, the Court finds that the Webers' claims under §§ 1692d and f survive summary judgment.

*Fourth*, Seterus argues that it "can conclusively demonstrate the existence of reasonable procedures in place to prevent the incorrect placement of an escrow account or other servicing errors as to the mortgage loans it services," thus establishing a bona fide error defense pursuant to § 1692k of the FDCPA. R. 96 at 15. "The bona fide error defense is an affirmative defense, for which the debt collector has the burden of proof." *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948 (9th Cir. 2011). "[T]o qualify for the bona fide error defense, the defendant must prove that (1) it violated the FDCPA unintentionally; (2) the violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid the violation." *Id.*; *accord Turner v. JVDB & Assocs., Inc.*, 318 F. Supp. 2d 681, 683 (N.D. Ill. 2004).

Seterus points to data integrity checks and other processes it has in place for newly boarded account data. But these are the same integrity checks that Seterus's corporate representative acknowledged did not catch the issue in this case—the relationship between "the escrow payment and refund in conjunction" with the settlement agreement—which he testified "could potentially raise a red flag." R. 95-5 at 44-45. The Webers point out vagueness in Seterus's policies and procedures, as well as provisions that simply mirror the FDCPA statute. R. 102 at 15-16. As with the other aspects of the Webers' FDCPA claims, the Court finds that weighing Seterus's "factual showing of actual safeguards" and whether they were "reasonably

adopted to avoid violations of the FDCPA" is a task for the jury. *Turner*, 318 F. Supp. 2d at 683.

For all of these reasons, the Court denies Seterus's motion for summary judgment with respect to the Webers' FDCPA claims (Count 8).

## IV.   ICFA

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons" against either "deceptive" or "unfair" conduct. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960-61 (Ill. 2002). The Webers allege that Seterus violated the ICFA by moving forward with foreclosure, by "wrongfully claiming that [BANA] did not commit any errors in imposing an escrow account," and by "stating that BANA was notified by the McHenry County Tax Assessor on June 8, 2015 that the taxes for the Home were delinquent when no such contact was actually made." R. 1 at 53-56.

Seterus rightly points out that it is not liable under the ICFA for the acts of BANA. *E.g.*, *Jackson v. South Holland Dodge, Inc.*, 755 N.E.2d 462, 470-71 (Ill. 2001). The analysis properly focuses on Seterus's own actions. Seterus argues that its own actions did not violate the ICFA as a matter of law because: (1) its "acts in maintaining the Escrow Account were in compliance with the terms of the Subject Loan"; and (2) it "did not make any misrepresentations in its NOE Response." It cites *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013), for the proposition that there is nothing "coercive" or "unfair" about "threaten[ing] to invoke the contractual remedies available" under a mortgage. *Id.* at 610.

As the Court has already found, there are genuine issues of material fact as to whether maintaining the escrow account was proper and whether Seterus made misrepresentations in its notice of error response. Moreover, Seterus's corporate representative admitted that "I guess it would be unfair" to the Webers for Seterus to stop following Fannie Mae's direction to sort out the escrow issue, and "I could see how it could be perceived by not reaching out to Bank of America that [the Webers] were possibly treated unfairly." R. 95-5 at 114, 120. The Court therefore finds fact disputes as to whether Seterus acted "unfair[ly]" for purposes of the ICFA, or whether it merely "threatened to invoke contractual remedies available" under the Webers' mortgage. *See Cohen*, 735 F.3d at 610. The Court denies Seterus's motion for summary judgment on the Webers' ICFA claim (Count 9).

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Seterus's motion for summary judgment (R. 94).

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 28, 2018